# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| In re Dependency of: | ) | No. 32320-0-III |
| | ) | |
| | ) | |
| O.R.L. | ) | ORDER WITHDRAWING |
| | ) | OPINION |
| | ) | |
| | ) | |
| | ) | |

The court on its own motion finds that the opinion filed March 24, 2015, should be withdrawn;

IT IS ORDERED that the opinion filed March 24, 2015, is hereby withdrawn and a new opinion shall be filed this day.

PANEL:     Judges Lawrence-Berrey, Brown, and Siddoway

FOR THE COURT:

LAUREL H. SIDDOWAY
CHIEF JUDGE

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re Dependency of: | ) | No. 32320-0-III |
| | ) | |
| O.R.L. | ) | PUBLISHED OPINION |
| | ) | |
| | ) | |
| | ) | |

LAWRENCE-BERREY, J. — K.L. appeals the trial court's order terminating her parent-child relationship with O.R.L. K.L. contends that the termination should be reversed because the Department of Social and Health Services (Department) failed to offer or provide all reasonably available services capable of correcting her parental deficiencies. Specifically, K.L. maintains that visitation is a remedial service that the Department failed to provide. We reaffirm *In re Dependency of T.H.*, 139 Wn. App. 784, 162 P.3d 1141 (2007), hold that visitation is not a required service, and affirm the trial court's order terminating K.L.'s parental rights to O.R.L.

FACTS

K.L. is the mother of O.R.L. born September 17, 2012. One week prior to O.R.L.'s birth, K.L.'s doctor sent a letter to the Department expressing concern for K.L. and the unborn child. The doctor stated that K.L. missed multiple scheduled appointments, was suffering from a long history of mental illness, attempted suicide multiple times, had no stable home, exhibited comprehension difficulties, and failed to utilize services available to her. The doctor also informed the Department that K.L. was seen panhandling as "homeless and pregnant," although she gave the doctor a different account of her living situation. Ex. P-4.

The day after O.R.L. was born, the Department removed O.R.L. from K.L.'s care and filed a petition for dependency. The dependency order was entered on November 7, 2012. The court found O.R.L. dependent because there was no capable parent of adequately caring for the child and because the child was in circumstances that placed her in danger of substantial damage to her psychological or physical development. The court required the following services to be offered to K.L.: drug and alcohol evaluation and treatment, random urinalysis, parenting classes, a psychological evaluation, mental health services and related medication management, a women's support group, and weekly contact with the caseworker.

No. 32320-0-III
*In re Dependency of O.R.L.*

The Department filed a termination petition in November 2013 due to K.L.'s alleged failure to participate in required services. On February 13, 2014, a termination hearing occurred to address K.L.'s parental rights.[1] At the time of the hearing, O.R.L. was a dependent minor for all but one day of her life, a little less than 15 months. The child was in a safe and stable foster care home and had an opportunity for adoption into a permanent family with her foster parents.

The testimony and exhibits at the hearing established that in the year prior to O.R.L.'s birth and through much of the dependency, K.L. was homeless or bouncing from house to house. When O.R.L. was born, K.L. was temporarily living with friends whose parental rights to their own children were terminated due to physical abuse. After a few days at this address, she continued to move house to house and shuffled between five different cities without finding permanent housing. However, at trial, K.L. testified that she moved into an apartment in Lewiston, Idaho, on November 3, 2013.

K.L. had a history of chronic unemployment and had not worked since 2009. She held only short-term jobs in the fast food industry, one that lasted two to three weeks and another that lasted three months. During the dependency, K.L. reported that her income was from disability.

---

[1] O.R.L.'s father relinquished his parental rights prior to the termination hearing.

3

*Ms. McDougall's Testimony.* Department social worker Sheila McDougall was assigned to O.R.L.'s case. Ms. McDougall said that the Department was concerned that K.L.'s mental illness would prevent her from parenting. She was also concerned that K.L. frequently moved residences and tended to stay with unsafe people or people she did not know well.

After O.R.L.'s birth, K.L. attended four weeks of visitation at the beginning of the dependency. However, she showed no understanding of how to care for an infant and did not appear to understand the normal actions of a child that age. One month into the dependency, K.L. discussed the possibility of relinquishing her rights. Shortly thereafter, K.L. lost contact with Ms. McDougall except for sporadic telephone calls to check in on O.R.L.

Ms. McDougall testified that the Department provided numerous services to assist K.L. These services included chemical dependency and psychological evaluations and treatment, a women's support group, a community sexual assault program, an alcohol dependency evaluation, counseling, an intensive outpatient program for mental illness, and parenting classes. The Department also provided opportunities for visitation and referrals for housing assistance.

From the beginning of the dependency in November 2012 until August 2013, K.L. failed to participate in the required intensive outpatient program for chemical dependency. Although she completed an initial chemical dependency evaluation in June 2013, she did not follow through with any treatment. She also scheduled two intake appointments in August and September 2013 with a different chemical dependency provider, but failed to show up for either appointment. In September 2013, K.L. finally began a behavioral health program, but she attended for only three days before abandoning the program. The program found her not amendable for treatment due to her untreated mental illness.

Around July 2013, K.L. contacted Ms. McDougall and asked to resume visitation. The Department determined that it was not in the child's best interest for K.L. to become involved unless she was truly going to work toward reunification. Ms. McDougall told K.L. that she could restart visitation once K.L. began to meaningfully engage in services. Ms. McDougall thought that it was not good for the child to develop a relationship with K.L. that would eventually disappear again. K.L. promised to engage in services, but failed to do so.

K.L. also failed to participate in other required services and eventually stopped contacting the Department in mid-November 2013. In January 2014, one month before

5

the termination hearing, K.L. participated in a one-day women's support group and again enrolled in an outpatient treatment program. There was no evidence at the hearing on whether K.L. followed up with either required service.

At some point, Ms. McDougall arranged for a meeting between K.L., O.R.L., and the foster parents, with the goal of convincing K.L. that O.R.L. was doing well in foster care. Ms. McDougall was hoping that K.L. would relinquish her parental rights and avoid the termination proceedings. Even though K.L. had not seen O.R.L. in many months, K.L. made statements indicating an intimate relationship with the child.

*Dr. Richard Gallaher's Testimony.* Also testifying at the hearing and submitting a report was Dr. Richard Gallaher, a clinical psychologist who treated K.L. K.L. was first offered a psychological evaluation in 2012, but she did not complete the process. One year later, in September 2013, K.L. reengaged in the evaluation process, and Dr. Gallaher completed his investigation. Dr. Gallaher diagnosed K.L. with schizophrenia, paranoid type, chronic posttraumatic stress disorder, and found multiple ongoing Axis IV psychosocial and environmental stressors that may have affected the diagnosis.

Dr. Gallaher also found that K.L. was quite scattered in her presentation and could not explain why child protective services had intervened. He noted that she described hallucinations and distorted thinking, had problems with good judgment, and described a

split personality that caused her not to remember what she did for up to three hours. K.L. also admitted hearing up to 10 voices at a time. Dr. Gallaher found K.L.'s psychosis was quite active in spite of medication, that her illness was a major deterrent to appropriate child care, and that it would be hard for her to provide a safe and stable environment for a baby.

Dr. Gallaher also evaluated K.L. with the MMPI-2,[2] a psychometric testing instrument. The evaluation suggested significant clinical problems, including somatic distress of an unusual nature, a pattern of ineffectiveness in life, difficulty managing routine affairs, disconnection from reality at times, and the likeliness of blatant hostility. Dr. Gallaher identified negative factors concerning parenting including major learning difficulties and long-term mental illness that was a primary factor in her inability to parent. He stated that she may not be willing to engage in more mental health treatment and that she had very few opportunities to receive ongoing support for her medication needs and counseling.

K.L.'s prognosis indicated that she was highly likely to remain unchanged unless she could maintain long-term stability, counseling, and manage her mental illness. Dr. Gallaher concluded that this would be very difficult to achieve. He found that K.L. was

---

[2] The Minnesota Multiple Personality Inventory-2.

not capable of parenting a child and that her very significant mental illness was very unlikely to improve.

Dr. Gallaher's report recommended that K.L. obtain a stable residence that would promote metal stability and stronger relationships with treatment providers. He also recommended that K.L. manage her mental illness with anti-psychotic and anti-depressant medications, as well as counseling, which would also help K.L. deal with a traumatic personal history.

*K.L.'s Testimony.* K.L. also testified at the hearing. She said that her mental stability had improved significantly, and after many years of unsafe and unstable residences, she secured housing and obtained an apartment. She said the apartment had sufficient space for O.R.L. K.L. also reported that her boyfriend, a convicted felon, would be living with her once he was released from an Idaho prison rehabilitation program. K.L. was pregnant with her second child at the time of the hearing. Although, when asked about the pregnancy, she repeated that she was unsure if she was pregnant because the doctor could not tell if she was 5 or 10 weeks along in her pregnancy after conducting an ultrasound.

K.L. acknowledged that she heard voices and hallucinated all of her life, but that symptoms diminished once she obtained a stable place to live and felt safe for the first

8

time. She also reported that she enrolled in an intensive outpatient treatment program and began attending support groups.

The trial court announced its decision at the conclusion of the trial. The court terminated K.L.'s parental rights. In ordering termination, the court found that the Department offered K.L. all necessary services, but she failed to sufficiently engage in the programs. Also, the court found that the Department met the criteria in RCW 13.34.180(1)(e) and (f) for termination. Finally, the court found that K.L. was unfit to parent and found termination was in the child's best interests. In making these findings, the court noted that mental illness in general does not render a parent unfit but, based on Dr. Gallaher's opinion, the severity of K.L.'s illness rendered her incapable of parenting O.R.L. The court also noted that K.L.'s newfound efforts to comply with services came too late.

K.L. appeals. She challenges the court's finding that the Department offered all necessary services under RCW 13.34.136 that were reasonably available and capable of correcting parental deficiencies within the foreseeable future. *See* RCW 13.34.180(1)(d). Specifically, K.L. contends that the Department failed to provide visitation, which she asserts is a reasonably available service capable of correcting her parental deficiencies.

9

No. 32320-0-III
*In re Dependency of O.R.L.*

ANALYSIS

The trial court in a termination of parental rights proceeding has broad discretion to evaluate the evidence in light of the rights and safety of the child. *In re Welfare of Siegfried*, 42 Wn. App. 21, 27, 708 P.2d 402 (1985). The decision of the trial court is entitled to great deference on review and its findings of fact are upheld if supported by substantial evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *World Wide Video, Inc. v. City of Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991) (quoting *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)). Unchallenged findings are verities on appeal. *In re Mahaney*, 146 Wn.2d 878, 895, 51 P.3d 776 (2002).

The reviewing court may not decide the credibility of witnesses or weigh the evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). The dominant consideration in a termination proceeding is the moral, intellectual, and material welfare interests of the children. *In re Dependency of J.W.*, 90 Wn. App. 417, 427, 953 P.2d 104 (1998). Where the parent's interest conflicts with the child's right to basic nurture, physical health, mental health, and safety, the rights of the child prevail. RCW 13.34.020.

10

No. 32320-0-III
*In re Dependency of O.R.L.*

"Under RCW 13.34.180 and RCW 13.34.190, a court may terminate parental rights if it finds (1) the requisite allegations are supported by clear, cogent, and convincing evidence and (2) termination is in the best interests of the child." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 29-30, 188 P.3d 510 (2008). "'Clear, cogent and convincing' means highly probable." *Id.* at 24.

The six allegations that the Department must prove in a termination hearing are:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

Washington courts have settled the question of whether visitation is a service that must be provided. In *T.H.*, the court held that visitation is not a service that the

11

Department is required to provide under RCW 13.34.180(1)(d). *T.H.*, 139 Wn. App. at 786. The court found that RCW 13.34.180(1)(d) refers to services ordered under RCW 13.34.136, and that RCW 13.34.136 affords services to a parent designed "'to enable them to resume custody.'" *T.H.*, 139 Wn. App. at 791 (quoting *In re Dependency of A.A.*, 105 Wn. App. 604, 608-09, 20 P.3d 492 (2001)). The court reasoned, "There may be situations where visitation is part of a required service, such as interactive parenting classes. But it does not, on its own, correct parental deficiencies to enable the parent to resume custody, and thus, we conclude that it is not a 'service' that must be provided under RCW 13.34.180(1)(d)." *T.H.*, 139 Wn. App. at 792. The court also recognized that RCW 13.34.136 clearly differentiates between services and visitation and, the fact that the legislature prohibited a trial court from limiting visitation as a sanction for not complying with services, evidences an intent that the visitation is not a service. *T.H.*, 139 Wn. App. at 792.

K.L. asks this court to reconsider *T.H.* and hold that visitation is a required remedial service under Washington law. K.L. contends that RCW 13.34.025, which addresses remedial services, incorporates a federal law that was revised in 2011 to make visitation a service. RCW 13.34.025(2)(a) states, "For purposes of this chapter, remedial services are those services defined in the federal adoption and safe families act [ASFA] as

12

time-limited family reunification services. Remedial services include individual, group, and family counseling; substance abuse treatment services; mental health services; assistance to address domestic violence; services designed to provide temporary child care and therapeutic services for families; and transportation to or from any of the above services and activities." Under the ASFA, as amended in 2011, time-limited family reunification services include "[s]ervices and activities designed to facilitate access to and visitation of children by parents and siblings." 42 U.S.C. § 629a(a)(7)(B)(vii).

K.L.'s argument is unpersuasive. First, while RCW 13.34.025(2)(a) references the federal law, it also specifically lists services to be provided. Visitation is not listed as a remedial service. Second, even if 42 U.S.C. § 629a(a)(7)(B)(vii) of the ASFA is incorporated into Washington law, it does not provide visitation, but instead provides services and activities designed to facilitate access to the children and visitation. Thus, if incorporated, the Department must offer services that would make visitation possible. For instance, if visitation is prohibited because of an anger issue by a parent, the Department would be required to provide services to address the anger issue so visitation would be possible. *See In re Welfare of S.J.*, 162 Wn. App. 873, 883-84, 256 P.3d 470 (2011).

13

No. 32320-0-III
*In re Dependency of O.R.L.*

We find no reason to depart from the reasoning of *T.H.* Nor do we believe that RCW 13.34.180(1)(d) or RCW 13.34.136 need reinterpretation. The legislature amended RCW 13.34.136 several times since *T.H.* was decided and did not revise the statute to include visitation as a service to be provided to parents.

All necessary services that were reasonably available and capable of correcting parental deficiencies within the foreseeable future were expressly and understandably offered or provided to K.L. The Department was ordered to provide drug and alcohol evaluation and treatment, random urinalysis, parenting classes, a psychological evaluation, mental health services and related medication management, and a women's support group. K.L. does not dispute that these services were offered to her or were capable of remedying her parental deficiencies. While visitation was offered to K.L., it was not a required remedial service.

Were we to examine the federal standard, we would conclude that the Department did offer services to K.L. that were designed to facilitate access to and visitation with O.R.L. The parenting classes and mental health treatment offered by the Department were remedial services designed to address K.L.'s parenting issues that she displayed during visitation when O.R.L. was an infant. However, K.L. made no effort to start

14

No. 32320-0-III
*In re Dependency of O.R.L.*

services. Without the ability to care for her child, O.R.L.'s safety was an issue and visitation was inappropriate.

The Department established all of the required statutory elements of RCW 13.34.180. Specifically, the Department offered or provided all reasonably necessary services capable of correcting K.L.'s parental deficiencies. The trial court did not err in ordering termination of K.L.'s parental rights to O.R.L.

Affirm.

Lawrence-Berrey, J.

WE CONCUR:

Brown, J.

Siddoway, C.J.

15